312 F.Supp.2d 1187 (2004)
Terence ANDERSON, Plaintiff,
v.
Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.
No. 4:02CV1758 DDN.
United States District Court, E.D. Missouri, Eastern Division.
March 17, 2004.
*1188 Frank J. Niesen, Jr., Niesen Law Office, St. Louis, MO, for Plaintiff.
Suzanne J. Gau, Office of U.S. Attorney, St. Louis, MO, for Defendant.

MEMORANDUM
NOCE, United States Magistrate Judge.
This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying plaintiff Terence Anderson's application for supplemental security income (SSI) benefits under Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 1381, et seq. The parties have *1189 consented to the exercise of plenary jurisdiction by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

I. BACKGROUND

A. Plaintiff's application
On December 26, 2000, plaintiff applied for SSI benefits. In support, he wrote the following. He was born in 1955 and had a twelfth-grade education. He held various short-term jobs from 1985 to 1992, including that as a cabinet maker, and he last worked, in 2000, earning $2399.25 as a dishwasher. As a cabinet maker he frequently lifted up to 100 pounds; in 1985, he earned $1335.70 making cabinets. (Tr. 73, 79, 82, 86, 91, 104.)
On March 1, 1997, he became unable to work because of diabetes, an enlarged hernia, and "water on knees," but he was required to work because he was incarcerated. In addition, his symptoms included indigestion, heartburn, bloating, swelling, headaches, and joint pain. Because of his impairments he could no longer walk, stand, lift, bend, and go up and down stairs. Severe pain kept him from staying asleep and his ability to care for himself had decreased. He was always in pain. His vision had worsened. He sometimes gets confused following directions. (Tr. 85, 110-14.)

B. Plaintiff's medical and prison records
In September 1997 plaintiff was hospitalized with inflammation of the colon, consistent with diverticulitis. He underwent an exploratory laparotomy with a resection of his sigmoid colon and primary anastomosis. He was discharged with instructions to refrain from driving or lifting more than 5 pounds. In November 1997 he was hospitalized with complicated diverticulitis and underwent an ileostomy closure. On discharge he was able to walk, tolerating a regular diet, and having bowel movements. (Tr. 145-47, 281-82.)
Plaintiff had surgery to repair an incisional hernia in February 1998. On discharge he was told to refrain from heavy lifting, driving, or tub bathing. Dr. Steven D. Crawford, a physician at the Farmington Correctional Center (FCC), where plaintiff was being incarcerated, noted in June 1998 that mesh from the hernia surgery had loosened, presenting a strangulation risk. He recommended surgery and no strenuous activity for six months. In July plaintiff complained of arthritic pain and was prescribed Naproxen. (Tr. 334, 375, 380-81.)
On October 11, 1998, plaintiff went to FCC's infirmary, complaining that he had been playing basketball for 5 to 10 minutes the previous day and that at night his knee swelled. His left knee had excess fluid in it. Fluid had been removed from the same knee in the past. He was given an ace bandage and a lay-in for two days. (Tr. 389-90.)
On December 15, 1998, plaintiff filed a medical services report, complaining of back pain. (Tr. 622.)
On September 20, 2000, plaintiff underwent a substance abuse evaluation. He stated that he had never been treated for psychological or emotional problems and reported having no such problems in recent days. Psychiatric intervention was not recommended. (Tr. 878, 880.)
On January 9, 2001, radiologist Vijaya Sahkhamuri, M.D., diagnosed plaintiff with minimal to moderate degenerative joint disease of the left knee. In an undated to-whom-it-may-concern letter, Dr. Sahkhamuri wrote that plaintiff has a large abdominal hernia, problems with his knees because of arthritis and fluid collection, and "might be experiencing difficulty *1190 bending, walking, lifting etc secondary to the above problems." (Tr. 846, 910.)
Eric Washington, M.D., who examined plaintiff on February 1, 2001, for complaints of left knee pain, noted slight swelling, a mild effusion, and medial compartment pain. Plaintiff's range of motion in the knee went up to 120 degrees; the knee was stable; strength was normal; and no crepitus was noted. The doctor drained fluid from the left knee, injected it, and wrote that plaintiff has "underlying degenerative disease after and will probably have intermittent and recurrent symptoms." He added that plaintiff would "continue to be up as tolerated." (Tr. 860.)
On March 27, 2001, consultant Kevin L. Threlkeld, M.D., completed a physical residual functional capacity (RFC) assessment. He opined that plaintiff could lift 20 pounds occasionally and 10 pounds frequently. He did not indicate any limitations in standing, walking, or sitting, but believed plaintiff had lower-extremity limitations. He opined that plaintiff's complaints of knee pain were partially credible, because of the x-ray findings and steroid treatment, but not to the level that no household chores could be done as his activities of daily living suggested. Thus, Dr. Threlkeld believed that plaintiff had postural limitations in all categories but for balancing and stooping, and no other limitations. (Tr. 901-08.)
Plaintiff returned to Dr. Washington on March 19, 2001. The doctor noted right knee swelling and tenderness in the medial and lateral joint lines. He drained 35 cubic centimeters of fluid from and injected plaintiff's right knee, and wrote that plaintiff could "be up as tolerated." When plaintiff returned on May 31, Dr. Washington noted swelling of the left knee, a moderate effusion, a range of 5 to 100 degrees, mild tenderness, no crepitus, and quadriceps strength of "4+/5." His assessment was probable degenerative joint disease of the left knee. He drained the knee again, gave another injection, and indicated that plaintiff could be up as tolerated. On July 19 Dr. Washington saw plaintiff for recurrent pain and swelling of the left knee. He drained more fluid from plaintiff's knee and spoke to plaintiff about the possibility of arthroscopic evaluation and debriding the knee. Plaintiff returned on January 10, 2002, to discuss possible arthroscopic treatment. Dr. Washington added internal derangement to the assessment and referred plaintiff for updated x-rays, which revealed moderate degenerative joint disease. (Tr. 128, 923, 926, 930-31.)

C. Plaintiff's testimony
At the hearing before the Administrative Law Judge (ALJ) on February 13, 2002, plaintiff testified to the following.
He has seven children, lives with his sister, and has no source of income. After high school he received vocational training in carpentry. While working as a cabinet maker, he injured his back when cabinets fell on him. Consequently, he still has problems bending and even sitting. His legs feel hot at least every other day. His hands, feet, legs, and back get numb. He has constant knee pain. His last injection from Dr. Washington adversely affected his ability to walk. (Tr. 29-31, 37-39, 53.)
Plaintiff got into drugs, was sent to FCC in 1998, and was released in May 2000. He had been clean from alcohol, drugs, and cigarettes for almost four years. Before going to FCC, he underwent stomach and intestinal surgery. While he was incarcerated, his stitches loosened and were not fixed. (Tr. 30-32, 39, 53.)
After FCC he was at St. Mary's Honor Center, where residents had to work or remain longer, so he got a job washing dishes and "running around" at a restaurant. Arthritis caused him to miss some *1191 work; eventually he was fired. He was told, but did not believe, that the reason was his poor attendance on account of pain. (Tr. 31-33.)
Mentally, plaintiff felt depressed over not being able to support his family. Physically, his basketball-sized hernia caused gas, intestinal clogging, and sharp pains every other week. Doctors would not operate on it because of his adult-onset diabetes, for which he took Glipizide and Ampicillin. Every other month he got a shot of insulin. He checked his blood-sugar levels daily, but did not adjust his medication levels, as his sugar levels remained the same. He has blurred vision but had not gotten any new glasses since leaving prison. He was never diagnosed with diabetes-related hemorrhaging of the eyes. (Tr. 33-36, 40.)
Running would cause him to fall. He had a cane at the hearing and uses it regularly; with it he can walk half a block without resting. To enter his house he pulls himself up a railing. He also has problems with ladders. Squatting even once causes back pain. He is able to bathe himself somewhat; his fiance helps him. He needs help dressing his lower body. His only pain medication, Tylenol or Ibuprofen 800, "works somewhat"; he avoids other pain medications because of his past drug problems. (Tr. 41-44.)
He does no yard work because bending causes pain. He does no housekeeping and cooks with a microwave. He does not drive because of the pain; sometimes he can barely control his legs. He can reach above his head, but his arthritis frequently causes such pain that he cannot hold up his arm. He can pick up a telephone. Twice a week he attends church; he also goes to Narcotics Anonymous and Alcoholics Anonymous meetings. (Tr. 44-47.)
He would like to work but cannot, because he cannot bend, carry anything, and satisfy his employer. He has problems holding and gripping things because of the arthritis. He can probably lift 25 pounds. He cannot pick anything off the floor. Generally, he does not pick up or move anything. He can move objects on a table one time. (Tr. 50-51, 53.)

D. The ALJ's decision
In a May 2, 2002 decision denying benefits, the ALJ found the following. Plaintiff has not engaged in substantial gainful activity since the alleged onset of disability. He has severe impairments  degenerative arthritis of the knees and a ventral hernia  but does not have an impairment or combination of impairments listed in, or equal to one listed in Appendix 1, Subpart P, Regulation No. 4. His allegations regarding his limitations were not totally credible for the reasons set forth in the body of the decision, e.g., (1) his poor work history and earnings record suggested he did not appear motivated to work, (2) he likely was motivated by secondary gain, this being his sixth application for benefits, (3) the medical evidence as to current treatment was quite limited, (4) he "admitted any blurred vision had improved with prescription glasses," (5) although he had a cane at the hearing, he admitted it had not been prescribed, (6) neither Dr. Sakhamuri nor any other treating or examining source ever reported any abnormality in plaintiff's gait or station or prescribed an assistive device, (7) there was no evidence of ongoing complaints of back pain, (8) plaintiff admitted Tylenol helped alleviate his pain in general, (9) he was undergoing no treatment for depression and took no psychotropic medication, and (10) he answered questions at the hearing in a clear and logical manner and did not show outward signs of discomfort. (Tr. 15-18.)
The ALJ also added that plaintiff's prison records revealed no significant and persistent symptoms warranting removal *1192 from the general prison population or special accommodations, and that "[i]t was even noted that he had adjusted well to prison and had been playing basketball." Further, the ALJ stated that notwithstanding Dr. Sakhamuri's undated statement that plaintiff might be having difficulties with some external activity due to his knee problems and hernia, no potent pain relievers were prescribed and no side effects from prescribed treatment were reported. (Tr. 16.)
Next, the ALJ stated that all of the medical opinions in the record regarding the severity of plaintiff's impairments had been carefully considered. In summarizing the record, the ALJ noted that there was reference to periodic treatment for left knee problems, and that plaintiff underwent aspiration and injection to his right knee in April 2001 and was released to activity as tolerated with a stable knee. Concurring with the state agency physicians as to a light type exertional capacity, the ALJ then found that plaintiff had the RFC to lift 20 pounds occasionally, carry 10 pounds frequently, and sit, stand, and walk on finished or even surfaces throughout a normal workday. The ALJ also found that plaintiff should avoid repetitive stair climbing, operating foot controls, and climbing ladders, ropes, and scaffolds. (Tr. 16-18.)
Based on plaintiff's age, education, and work experience (which was not found relevant), and an exertional capacity for at least sedentary to light work, which was substantially intact and not compromised by any nonexertional limitation, the ALJ concluded that Rules 201.20 and 201.21 of Appendix 2 to Regulation No. 4 directed a conclusion of not disabled. (Tr. 19.)
As set forth in greater detail below, plaintiff challenges the ALJ's credibility and RFC determinations.

II. DISCUSSION

A. General legal framework
The court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir.2002). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id.; accord Jones v. Barnhart, 335 F.3d 697, 698 (8th Cir.2003). In determining whether the evidence is substantial, the court must consider evidence that detracts from, as well as supports, the Commissioner's decision. See Brosnahan v. Barnhart, 336 F.3d 671, 675 (8th Cir.2003). So long as substantial evidence supports the final decision, the court may not reverse merely because opposing substantial evidence exists in the record or because the court would have decided the case differently. See Krogmeier, 294 F.3d at 1022.
To be entitled to benefits on account of disability, a claimant must prove that he is unable to perform any substantial gainful activity due to any medically determinable physical or mental impairment which would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920[1]; see also *1193 Bowen v. Yuckert, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (describing the framework); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir.2003).

B. The ALJ's credibility determination
Plaintiff argues that the ALJ based the credibility determination on a "mere scintilla of evidence" and gave too much weight to the fact that plaintiff brought a cane to the hearing even though use of a cane had not been prescribed.
Notwithstanding plaintiff's arguments, substantial evidence supports the ALJ's determination that plaintiff's allegations regarding his limitations were not totally credible. As set forth above, the ALJ provided numerous, valid reasons in support of the credibility determination.[2]See Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir.2001) ("A lack of work history may indicate a lack of motivation to work rather than a lack of ability."); Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir.2001) (the ALJ's personal observations of the claimant's demeanor during the hearing was "completely proper in making credibility determinations; impairments controllable or amenable to treatment do not support a finding of total disability"); Rankin v. Apfel, 195 F.3d 427, 429 (8th Cir.1999) (infrequent use of prescription pain medication supports discrediting complaints); Bates v. Chater, 54 F.3d 529, 531 (8th Cir.1995) (noting no reported side effects from medications); Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir.1993) (a poor work history can lessen a claimant's credibility); cf. O'Donnell v. Barnhart, 318 F.3d 811, 816-17 (8th Cir.2003) ("an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them" (emphasis added)).
Given that the ALJ noted plaintiff's playing basketball in the same sentence with adjusting well to prison life, the court is not persuaded by plaintiff's suggestion (Doc. 16 at 10) that the ALJ improperly used the basketball playing to decide that plaintiff was only partially credible about his physical abilities. Moreover, contrary to plaintiff's suggestion that the ALJ ignored the portion of Dr. Sakhamuri's undated note that mentioned the hernia and knee problems, the ALJ found that those conditions constituted severe impairments. Finally, the ALJ's comment that plaintiff used a cane at the hearing was not improper. See Myers v. Barnhart, 285 F.Supp.2d 851, 862 (S.D.Tex.2002) (a claimant's testimony that she was not medically prescribed any assistive device for pain but chose to use a cane on her own supported the ALJ's finding that she was not suffering from disabling pain).

C. RFC
Plaintiff next argues that, with respect to his RFC, the ALJ failed to give "great weight" to the opinion of his treating physician, Dr. Washington. Specifically, he maintains that the ALJ mentioned but one of plaintiff's six-plus visits to Dr. Washington, failed to mention the doctor by name, and failed to describe the specifics of the visits, e.g., that on July 19, 2001, Dr. Washington suggested that plaintiff might want to consider surgery. Thus, he submits that the ALJ failed to give good *1194 reasons for the weight given to the doctor's opinion. (Doc. 16 at 12-14.)
Defendant responds that Dr. Washington "did not offer an opinion" and asserts that the ALJ clearly considered plaintiff's treatment under Dr. Washington. (Doc. 19 at 8.)
"Medical opinions" are "statements from physicians ... that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). A treating physician's opinion normally is entitled to substantial weight. Dixon v. Barnhart, 353 F.3d 602, 606 (8th Cir.2003). Unless a treating physician's opinion is given controlling weight, the ALJ should consider each of the following factors in evaluating every medical opinion: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the treating physician is also a specialist; and (6) any other factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(d)(1)-(6). Regardless of how much weight the ALJ affords a treating physician's opinion, however, the ALJ must "always give good reasons" for the weight given. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p, 1996 WL 374188, at *5 (SSA July 2, 1996); accord Dolph v. Barnhart, 308 F.3d 876, 878-879 (8th Cir.2002). Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir.1999); see Singh v. Apfel, 222 F.3d 448, 452-53 (8th Cir.2000) (reversing with directions to remand in part because the ALJ failed to give good reasons for rejecting a treating physician's opinion); Knudsen v. Barnhart, No. C02-4108, 2003 WL 22959818, at *25 (N.D.Iowa Dec. 16, 2003) (the ALJ failed to justify adequately his decision to discount the treating physicians' opinions); Selk v. Barnhart, 234 F.Supp.2d 1006, 1013 (S.D.Iowa 2002) (same).
Notwithstanding defendant's unsupported assertion to the contrary, the court concludes that Dr. Washington offered a medical opinion. For example, on February 1, 2001, he opined that plaintiff would probably have intermittent and recurrent symptoms and directed that plaintiff could be up as tolerated. See 20 C.F.R. § 404.1527(a)(2); cf. Blake v. Massanari, 2001 WL 530697, at *12 (S.D.Ala.2001) (doctors' notations did not constitute opinions but rather were recitations of plaintiff's complaints).
The court is cognizant that "an ALJ is not required to discuss every piece of evidence submitted," Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998), and notes that the administrative transcript in this case exceeds 900 pages. Nonetheless, the ALJ was still required to give good reasons for the weight given to Dr. Washington's opinion. Because the ALJ failed to indicate the weight given to Dr. Washington's opinion, much less provide good reasons for the weight given, remand is necessary.[3]
An appropriate order shall issue herewith.

ORDER
In accordance with the Memorandum filed herewith,
*1195 IT IS HEREBY ORDERED that the final decision of defendant Commissioner of Social Security denying supplemental security income benefits is reversed. The action is remanded to the defendant Commissioner for further proceedings. On remand, the ALJ shall evaluate the opinion of Eric Washington, M.D., pursuant to 20 C.F.R. § 404.1527 and give good reasons for the weight accorded to this treating physician's opinion.
NOTES
[1] These Regulations were amended, effective September 25, 2003. See Clarification of Rules Involving Residual Functional Capacity Assessments; Clarification of Use of Vocational Experts and Other Sources at Step 4 of the Sequential Evaluation Process; Incorporation of "Special Profile" Into Regulations, 68 Fed.Reg. 51,153, 51,163, 55,164 (Aug. 26, 2003).
[2] The ALJ's decision inaccurately indicates that plaintiff admitted any blurry vision had improved with prescription glasses. Nonetheless, because (1) plaintiff did not allege disability on account of his vision, (2) at the hearing the ALJ inquired about plaintiff's vision in connection with his diabetes, and (3) the written decision provides other valid reasons for discrediting plaintiff's allegations of disabling diabetes, this mischaracterization of plaintiff's testimony is immaterial.
[3] The court does not reach plaintiff's argument that the ALJ gave too much weight to consulting physician Dr. Threlkeld's RFC report, because the degree of weight given to the consulting physician's opinion (relative to Dr. Washington's opinion) may change on remand when the ALJ properly assesses Dr. Washington's opinion.